## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE RESTRAINT OF EIGHT REAL PROPERTIES AND ONE JPMORGAN CHASE BANK ACCOUNT OWNED OR CONTROLLED BY MEIR OHANA | Misc. No. _____ **UNDER SEAL** |

## UNITED STATES' EX PARTE APPLICATION
## TO REGISTER AND ENFORCE FOREIGN RESTRAINING ORDERS
## PURSUANT TO 28 U.S.C. § 2467(d)(3) AND 18 U.S.C. § 983(j)

Applicant United States of America, by and through its undersigned attorneys, respectfully submits this application for a restraining order pursuant to 28 U.S.C. § 2467(d)(3) and 18 U.S.C. 983(j). The application seeks to enforce two restraining orders issued by the Magistrate's Court in Rishon Le-Zion, Israel, in order to preserve the availability of U.S. assets that are subject to forfeiture in Israel until Israel presents a final forfeiture or confiscation judgment to the United States Central Authority for execution pursuant to the relevant bilateral treaty.[1] The restraining orders, issued January 9, 2014, and April 8, 2014, stem from an Israeli criminal investigation into an illegal bank and potential trade-based money laundering operation managed by Meir Ohana on the floor of the Diamond Exchange in Ramat Gan, Israel from approximately 2010-2011. The restraining orders have been certified for enforcement by the Acting Assistant Attorney General of the U.S. Department of Justice's Criminal Division in accordance with 28 U.S.C. § 2467(d)(3) and (d)(3)(B)(ii). Ohana is the owner or beneficial owner of a bank account and eight real properties named in this application and the attached proposed restraining order. The assets sought to be restrained are approximately worth a

---

[1] *See* Treaty with Israel on Mutual Legal Assistance in Criminal Matters, U.S.-Isr., Jan. 26, 1998, S. Treaty Doc. No. 105-40.

combined $617,000.

Meir Ohana was arrested during a January 8, 2012, Israel Police raid on the illegal bank at the Diamond Exchange in Ramat Gan. He was questioned and released, but a travel ban was issued prohibiting Ohana from leaving Israel. Ohana and two other suspects, Menachem Magen and Doron Elad, were formally invited to a pre-indictment hearing before the District Attorney on June 16, 2013. Ohana failed to appear, but he was and remains represented by an attorney. Israeli authorities have officially commenced criminal and forfeiture proceedings and two additional orders restraining assets in Israel were issued and extended by the Magistrate's Court pertaining to $375,000 and Ohana's residence. Israeli authorities expect to indict Ohana upon the execution of two mutual legal assistance requests sent to other foreign authorities and the restraint of his U.S. assets. Since Ohana's travel ban expired, he recently spent a month in the United States and has been acquiring assets here, despite knowing that he is the target of a criminal investigation in Israel.

## I.   JURISDICTION AND VENUE

This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 2467. Venue is proper in this Court pursuant to § 2467(c)(2)(B), which provides that "venue shall lie in the district court for the District of Columbia or in any other district in which the defendant or the property . . . may be found."

## II.   APPLICATION

The United States seeks issuance of a restraining order pursuant to § 2467(d)(3) to enforce two Israeli restraining orders against assets owned or controlled by Meir Ohana. In one request pursuant to the 1998 U.S.-Israel Mutual Legal Assistance ("MLA") Treaty, Israel asked the United States to enforce a restraining order issued on January 9, 2014, by Judge Menachem

Mizrahi of the Magistrate's Court in Rishon Le-Zion.  In a subsequent MLA request, Israel asked the United States to enforce an additional restraining order issued on April 8, 2014, by the same judge.  The United States, with the appropriate certification of the Acting Assistant Attorney General annexed hereto as Exhibit A, applies to this Court to issue an order restraining the following assets[2]:

Pursuant to the January 9, 2014 Order of the Magistrate's Court in Rishon Le-Zion

1.  4444 Dennis Way, Las Vegas, Nevada 89121
2.  5215 Ferrell Mountain Court, North Las Vegas, Nevada 89031

Pursuant to the April 8, 2014 Order of the Magistrate's Court in Rishon Le-Zion

3.  5664 Dillwood Crescent Lithonia, GA 30058
4.  3951 Valpariso Circle Decatur, GA 30034
5.  912 Mainstreet Park Court Stone Mountain, GA 30088
6.  6268 Creekford Lane Lithonia, GA 30058
7.  6290 Stillwater Drive Riverdale, GA 30274
8.  5998 Radford Drive Riverdale, GA 30296
9.  JPMorgan Chase Bank Account Number 187331739

## III.   FACTUAL BACKGROUND

The Israel Police National Fraud Investigation Unit and the Israel Tax Authority are investigating an illegal bank that operated out of the Diamond Exchange in Ramat Gan, Israel, from approximately 2010-2011.  The main suspect, an Israeli national and licensed diamond trader named Meir Ohana, is suspected to have laundered up to $148 million in a trade-based money laundering scheme camouflaged as legitimate commerce in diamonds.  Israel intends to charge Ohana with the following offenses:  (1) money laundering, in violation of sections 3 and

---

[2] All of the listed assets are owned by Meir Ohana, directly and solely, with the exception of asset numbers 7 and 8, which are owned by a Georgia company, Miermeir LLC.  Ohana is the sole owner of that company.  Previously, Ohana transferred ownership to assets 4, 5, and 6 via quitclaim deed to Miermeir LLC, but he recently transferred ownership back to himself in successive transactions.  Not one of the eight properties to be restrained is encumbered by a lien or mortgage, however, both Nevada properties appear to be occupied by renters as of November 2013 and the Georgia properties are or have been advertised for rent on the internet.  Israel's second restraining order also names two closed bank accounts.  The closed accounts are omitted from the United States' proposed order because there are no funds to restrain on Israel's behalf.

3

4 of the Prohibition on Money Laundering Law, 5760-2000; (2) obtaining property by deception (fraud), in violation of sections 415, 418, and 420 of the Penal Law, 5737-1977; (3) operating an unlicensed bank, in violation of the Banking Law, 5741-1981; (4) customs offenses, in violation of sections 211(a)(1), 212(a)(3), (4), (6), and (8) of the Customs Law; and (5) tax offenses, in violation of the Income Tax Ordinance, 5721-1961 and the Value Added Tax Law, 5736-1975.

Ohana's illegal bank operation—run with the assistance of rogue diamond traders and their denominated diamond trader import-export accounts—was based on the floor of the Israel Diamond Exchange in Ramat Gan, the world's largest diamond exchange.  The money laundering operation exploited special provisions of Israeli law that are intended to encourage the efficient operation of the legitimate diamond market.  Diamond traders are allowed to import diamonds into Israel without paying import taxes and they are permitted to transfer money outside of Israel in amounts corresponding to the value of imported diamonds.  These transfers are not subject to statutory reporting requirements under Israel's anti-money laundering (AML) regime.   Currency reports are not generated for transactions exceeding certain monetary thresholds, and when licensed diamond dealers pay their global suppliers for imported diamonds, unusual transactions are not detected or disclosed in reports.  To qualify for the tax exemption and to conduct transactions not subject to normal AML monitoring, licensed diamond importers must declare, upon arrival in Israel with diamonds, that they have imported stones worth a certain amount.  The diamonds are then put into sealed bags by Israeli customs authorities at the point of entry.  Within forty-eight hours of arrival and declaration, the diamond importer must present the sealed bag at a special customs office in Ramat Gan.  After inspection, the diamonds are cleared and exempted from import duties and the trader may then transfer abroad the declared value of the imported diamonds without triggering AML reporting obligations.

Ohana abused this system by arranging phony diamond importations and by issuing fake invoices for diamond transactions that never occurred. He arranged for various persons to come to Israel and declare that they were importing diamonds, but those persons either: (1) did not bring in 'new' diamonds; (2) did not bring authentic diamonds; or (3) did not bring diamonds equal to their declared value. During the forty-eight hour period before these persons were due to bring their imports to the Ramat Gan customs office, Ohana often borrowed diamonds from rogue traders at the Exchange and instructed his accomplices to present customs officials with the borrowed diamonds, as if they had been imported from outside of Israel. Ohana would return the borrowed diamonds when they were cleared for duty-free import. Using the methods described above, Ohana earned valuable "transfer rights" that permitted him to disperse large sums of money abroad, entirely free of AML oversight. On behalf of his clients, whose identities and source of funds are mostly unknown (save some diamond traders seeking to avoid taxes), Ohana wired money around the globe and collected a commission for doing so. He unlawfully evaded Israel's AML regime and aided his clients to do the same, moving $148 million out of Israel, including $71 million in 2011. Additionally, Ohana provided money services through a side-business run by Magen and Elad at the Diamond Exchange. Diamond traders wrote checks to Ohana, who provided invoices based on fake diamond transactions. The traders presented the checks to Magen and Elad, who cashed them and took a 2.25% commission. Ohana also received a 1.5% commission for his part in the check cashing business.

This and other illegal banks in the Israel Diamond Exchange are known by Israeli authorities to be money laundering vehicles used by a variety of criminals. The Israel Police suspect that Ohana did not carry out any legitimate diamond importations and that he exclusively profited from his criminal activities. This suspicion comports with facts uncovered by U.S. law

enforcement, who observed a pattern whereby Ohana wired money into his U.S. accounts in the names of Emerald Blue Lake LLC or Crown Victoria LV LLC, and then, either that same day, or a few days later, he wired a roughly corresponding amount to one of many world-wide recipients, persons and businesses, large and small. For a time, Ohana conducted this activity through his personal bank accounts in Israel by sending wires to his beneficiaries directly. Since he established two Nevada limited liability companies in 2011, Ohana has been using his corporate accounts instead. Beginning in 2011, he greatly expanded the value and frequency of these transactions with no apparent business purpose. Funds passing through these U.S. accounts were primarily sent on to beneficiaries in China and the United States (among thirty other countries, very few of which are known to supply diamonds). Ohana's bank accounts have mostly been closed at U.S. financial institutions and his companies in Nevada have been dissolved. However, one company has recently been re-registered in Georgia, and Ohana formed a new company in Georgia in October 2013: Miermeir LLC.

## IV.   LEGAL AUTHORITY

Pursuant to 28 U.S.C. § 2467(d)(3), federal courts are authorized to issue orders to preserve property during the pendency of foreign forfeiture proceedings until receipt of an enforceable, final foreign forfeiture or confiscation judgment. *See* Preserving Foreign Criminal Assets for Forfeiture Act of 2010, Pub. L. No. 11-342, 124 Stat. 3607 (codified as amended in 28 U.S.C. § 2467(d)(3)).[3]  Section 2467(d)(3)(A) provides:

> [t]o preserve the availability of property subject to civil or criminal forfeiture
> under foreign law, the Government may apply for and the court may issue a

---

[3] On December 22, 2010, Congress amended 28 U.S.C. § 2467(d)(3) partly in response to case law limiting courts' authority under the prior iteration of the statute to freeze assets only after a foreign court had entered a final forfeiture judgment. *See In re Any and All Funds or Other Assets in Brown Bros. Harriman & Co. Account # 8870792 in the Name of Tiger Eye Inv. Ltd.*, 613 F.3d 1122 (D.C. Cir. 2010). As amended, the statute now clearly authorizes courts to issue a restraining order "at any time before or after the initiation of forfeiture proceedings by a foreign nation." 28 U.S.C. § 2467(d)(3)(A)(i) (2012).

restraining order at any time before or after the initiation of forfeiture proceedings by a foreign nation.

Section 2467(d)(3)(A) also requires that the U.S. restraining order be issued "consistent with subparagraphs (A), (C), and (E) of subparagraph [(d)](1) and the procedural due process protections for a restraining order under section 983(j) of title 18." 28 U.S.C. § 2467(d)(3)(A). Consequently, the district court may deny enforcement of a foreign restraining order if it finds that the order was obtained without due process, was issued by a foreign court that lacked subject matter jurisdiction, or was obtained by fraud. In addition, the cross-references to § 983(j) do not require that forfeiture proceedings, civil or criminal, be filed in the United States, but rather, refer to applicable foreign criminal or forfeiture proceedings initiated abroad. *See* 28 U.S.C. § 2467(d)(3)(A)(ii)(II); *see also Luan v. United States*, 722 F.3d 388, 394-97 (D.C. Cir. 2013) (holding that the filing of a foreign civil forfeiture complaint is not required, but that "applicable" foreign criminal proceedings, sufficient to justify the restraint of assets indefinitely pending final forfeiture, should entail "procedural due process protections consistent with those that the filing of an American civil forfeiture complaint" would have afforded). In line with analogous procedures in a domestic civil or criminal forfeiture proceeding under 18 U.S.C. § 983(j), U.S. courts may issue an order fashioning the appropriate relief to preserve property during the pendency of foreign criminal or forfeiture proceedings.

A prerequisite for the enforcement of a foreign restraining order is certification by the Attorney General that enforcement of the order is in the "interest of justice." 28 U.S.C. § 2467(b)(2). On May 9, 2006, the Attorney General delegated authority for the certification of orders under this provision to the Assistant Attorney General for the Criminal Division. *See* Exhibit B, DOJ Order No. 2820-2006. The Assistant Attorney General's determination is a statutory requirement for enforcement of a court-issued, foreign restraining order and the

decision is not subject to judicial review. *See* 28 U.S.C. § 2467(d)(3)(B)(ii) and § 2467(b)(2).

## V.    DISCUSSION

### A.    The Israeli Restraining Orders Meet the Criteria for Enforcement Under § 2467(d)(3)(A).

Section 2467 sets forth the following criteria relevant in considering a request for enforcement of a foreign restraining order: (1) whether the United States and the foreign nation seeking enforcement of the order are parties to a formal, international agreement providing for mutual forfeiture assistance, § 2467(a)(1); (2) whether the Attorney General has determined it would be in the interest of justice to certify the order for enforcement, § 2467(b)(2); (3) whether the foreign order was issued consistent with due process, § 2467(d)(3)(A)(ii)(I); (4) whether the foreign court had subject matter jurisdiction to issue the restraint, *id.*; and (5) whether there is any reason to believe the foreign order was obtained by fraud, *id.*[4]  The certified Israeli restraining orders meet the above criteria for registration and enforcement pursuant to § 2467 and, therefore, entry of the proposed U.S. restraining order is both necessary and appropriate to preserve the property for eventual forfeiture in Israel.

### 1.    Agreement on Forfeiture Assistance

First, the United States and Israel are parties to a MLA Treaty that entered into force on May 25, 1999.[5]  Under article 17 of the Treaty, the United States is obligated to assist Israel in

---

[4] *See In re Restraint of All Assets Contained or Formerly Contained in Certain Investment Accounts at UBS Fin. Servs., Inc.*, 860 F. Supp. 2d 32, 42 (D.D.C. 2012) (asserting that in considering an application for a restraining order under § 2467(d)(3), a "district court should begin with the premise that the foreign proceedings or procedures are in fact compatible with due process").   An affected party may appear in this proceeding to challenge any U.S. restraining order issued as a result of this application by making an affirmative showing that the foreign order or process were defective.

[5] *See* Treaty with Israel on Mutual Legal Assistance in Criminal Matters, U.S.-Isr., Jan. 26, 1998, S. Treaty Doc. No. 105-40.

forfeiture matters, including the restraint of suspected criminal proceeds and instrumentalities, such that the first criterion is satisfied.

      2.    Attorney General Certification

Second, both Israeli restraining orders were certified by the Acting Assistant Attorney General on May 8, 2014. The Acting Assistant Attorney General, in certifying the order, acknowledges that he has considered the facts of the case, the foreign law, the applicable U.S. law, and the circumstances of the judiciary from where the order came, and has concluded that enforcement of the foreign restraining order pursuant to 28 U.S.C. § 2467 is "in the interest of justice." *See* Exhibit A, AAG Certification and Israeli Restraining Orders. Thus, the second criterion for enforcement is met.

      3.    Due Process

Third, both Israeli restraining orders were issued consistent with due process. Sections 32(a) and 34 of Israel's Criminal Procedure Ordinance, 5729-1969, and sections 21 and 26(a) of the Prohibition of Money Laundering Law, 5760-2000, authorize the freezing of property to prevent its dissipation by the suspect or others and to preserve such property for forfeiture, pending conviction. The applications for restraint were made ex parte by the State Attorney and the Israel Police. An impartial magistrate issued the orders restraining the U.S. properties "and any other asset in which Meir Ohana . . . has a proprietary interest of any kind" (Jan. 9, 2014 Order), based on the State Attorney's motions and confidential, sworn police reports using the investigator's personal knowledge of the investigation. Judge Menachem Mizrahi[6] determined, twice, that there was prima facie evidence to believe that the assets ordered restrained were owned by Ohana, the main suspect in a criminal investigation. Following the restraint of the

---

[6] Judge Mizrahi is familiar with the facts and circumstances of this investigation. He extended Ohana's domestic restraining orders, issued on January 9 and 10, 2012.

U.S. assets, the Israel Police will notify Ohana of the existence of both orders, much the same way that he was notified of the domestic orders following his arrest. Ohana and any third parties will be afforded the opportunity to challenge the restraining orders issued by the Magistrate's Court.[7]  Ohana did retain counsel to represent him in the domestic forfeiture proceedings, although he did not attend a pre-indictment hearing in connection with the criminal proceedings against him. Finally, the Israel Police must justify the continued restraint of the assets every 180 days until an indictment is obtained or at periods determined by the judge.

4.    Subject Matter Jurisdiction

Fourth, the Magistrate's Court in Rishon Le-Zion is the proper court to issue the restraining orders in this matter. It is a criminal court with subject matter jurisdiction over the Ohana investigation on the basis that it is the local court of the Israel Police National Fraud Investigation Unit.

5.    Absence of Fraud

Finally, the United States believes that neither the January 9, 2014, restraining order nor the April 8, 2014, order was obtained by fraud on the part of Israeli authorities. As such, ample justification exists for the registration and enforcement of the orders in the United States against eight pieces of real property and one bank account.

---

[7] A challenge to a court-issued restraining order can be heard under section 34 of Israel's Code of Criminal Procedure. The relevant portion states:

> on application by a policeman . . . or on application by a person who claims a right in the object, a Magistrate's Court may order that the object be delivered to the person who claims a right to it or to some specific person or that it be dealt with otherwise as the Court shall order, all on conditions to be prescribed in the order.

While the provision does not require the Israel Police to notify the affected individual, they do so in practice. The provision also gives the affected person (and any other potential claimant) automatic standing to challenge a seizure or restraint, including spouses who are not involved in the underlying criminal offenses and may be entitled to up to fifty percent of seized or restrained assets.

**B.     Dual Forfeitability, While Not Required to Enforce a Foreign Restraining Order, Is Satisfied.**

In an application to enforce a foreign restraining order (as opposed to a final judgment), the United States is not required to show that the criminal conduct supporting the foreign restraining order would also give rise to forfeiture if it had been committed in the United States. *See In re Restraint of All Assets Contained or Formerly Contained in Certain Investment Accounts at UBS Fin. Servs., Inc.*, 860 F. Supp. 2d 32, 41 (D.D.C. 2012) ("[Section 2467(d)(3)] does not expressly incorporate the dual forfeiture requirement that applies to final orders of forfeiture."). Nevertheless, dual forfeitability may become relevant if and when Israel asks the United States to enforce a final forfeiture or confiscation judgment. *See* 28 U.S.C. § 2467(a)(2)(A)-(B). The United States expects that dual forfeitability could be satisfied here because Ohana's criminal conduct likely would have violated U.S. criminal laws giving rise to forfeiture had such offenses been committed in this country.

Specifically, Ohana would have violated 18 U.S.C. § 1960 (operating an unlicensed money transmitting business); § 542 (making a false customs declaration); and § 1956(h) (money laundering conspiracy).[8] Making a false statement on customs paperwork (18 U.S.C. § 542) is a specified unlawful activity ("SUA") for money laundering for which forfeiture is authorized. *See* 18 U.S.C. § 1956 (c)(7)(D) (entry of goods by means of false statements is an SUA); *see also* § 981(a)(1)(A) (civil forfeiture of property involved in, or traceable to, a money laundering

---

[8]   If Ohana conducted his activities in the United States, he might also be subject to prosecution for additional offenses that do not authorize forfeiture, such as tax evasion, false statements, and failure to establish and maintain an effective AML program. In the United States, Ohana likely would be considered a "dealer in precious metals, stones, or jewels," which means his business would qualify as a "financial institution" for the purposes of the Bank Secrecy Act. Therefore, Ohana would have to maintain an AML program—including, at a minimum, the establishment of internal AML policies, procedures, and controls, the designation of a compliance officer, an ongoing employee training program, and an independent audit function—which he did not. *See* 31 U.S.C. § 5312(a)(2)(N) (defining financial institution); § 5318(h)(1) (describing the AML program required of financial institutions). Although forfeiture is not a penalty for failing to have an anti-money laundering program, it is an indictable offense subject to criminal and civil penalties.

transaction); § 982(a)(1) (criminal forfeiture of the same). Additionally, filing false customs declarations gives rise to forfeiture independently of any money laundering violation. *See* §§ 981(a)(1)(C) and 982(a)(2)(B). Lastly, any property, real or personal, involved in or traceable to a money laundering transaction, including violations of §§ 1956 or 1960, is forfeitable. *See* §§ 981(a)(1)(A) and 982(a)(1).

Ohana conducted what would be, in the United States, an unlicensed money transmitting business by wiring money around the world on behalf of "clients" and by providing check cashing services on the floor of the diamond exchange, all without a license, and, in some circumstances, with funds he knew to be criminal proceeds. *See* 18 U.S.C. § 1960(b)(1)(B), (b)(1)(C). In Israel, the equivalent charge is conducting specific activities reserved for banks in violation of Section 21 of Israel's banking law, such as accepting deposits of funds from thirty or more persons at one time. Further, Ohana and his co-conspirators routinely made false customs declarations when he borrowed diamonds that were already in Israel and presented them to customs officials as diamonds that he imported. They also lied on customs forms about the value of the stones and provided numerous fake invoices to substantiate Ohana's wire activity. *See* 18 U.S.C. § 542; *United States v. Avelino*, 967 F.2d 815, 817 (2d Cir. 1992) ("To be convicted for false statements under Section 542, a defendant must: (1) attempt to import merchandise into the United States (2) "by means of" a false statement (3) without reasonable cause to believe the truth of such statement or practice."). Additionally, if Ohana knew that his "clients" were seeking to launder the proceeds of crime, intending to, for example, evade taxes, then he may have engaged in a money laundering conspiracy. *See* 18 U.S.C. § 1956(h).

C.   **This Court Should Act to Enforce the Israeli Restraining Orders by Issuing a Restraining Order in a Manner Consistent with 18 U.S.C. § 983(j)(1).**

Pursuant to the Preserving Foreign Criminal Assets for Forfeiture Act, 28 U.S.C. § 2467(c)(2)(B) and § 2467(d)(3)(A) authorize the District Court for the District of Columbia to enter a restraining order to preserve the availability of property subject to civil or criminal forfeiture under foreign law.   The Israeli restraining orders reflect the intention of Israeli prosecutors to seek the forfeiture of assets in connection with the criminal prosecution of Ohana and his co-conspirators.   Thus, the United States seeks to guarantee the effectiveness of any future forfeiture order against Ohana's U.S. assets.

Consequently, applying the language of § 2467(d)(3)(A) and structure under 18 U.S.C. § 983(j)(1)(A), this Court possesses the authority to issue an order—consistent with the Israeli restraining orders—to "preserve the availability of property . . . subject to forfeiture" for the duration of the Israeli forfeiture proceedings. *See* 28 U.S.C. § 2467(d)(3)(A) (specifying that the district court may enter a restraining order at any time before or after the initiation of foreign forfeiture proceedings). As such, this Court should recognize the Israeli court's orders and enforce them according to their terms by freezing the specified assets and prohibiting Ohana and all others from disposing of these U.S. assets or rights thereto. *See* Exhibit A, AAG Certification and Israeli Restraining Orders (Jan. 9, 2014, Restraining Order, ¶¶1-2, and April 8, 2014, Restraining Order, ¶¶1-2). As to the bank account at the financial institution referenced herein (Asset 9, Section II), the United States will serve any order issued by this Court upon the relevant institution and freeze the contents of the bank account in place. As to the real property referenced herein (Assets 1-8, Section II), the United States will record *lis pendens* with the relevant counties in Georgia and Nevada, as specified by state law, thus informing any interested

party that each of the eight properties is subject to forfeiture proceedings in Israel and notifying the public that each property is restrained by the United States on behalf of Israel.

## VI.    CONCLUSION

The United States respectfully requests that this Court enforce the attached Israeli restraining orders, consistent with U.S. obligations under the relevant treaty, by entering the attached proposed order pursuant to this Court's authority under 28 U.S.C. § 2467(d)(3)(A), (d)(3)(B)(ii), and 18 U.S.C. § 983(j)(1)(A). The United States anticipates assistance from the Israeli Ministry of Justice in providing notice and a copy of any order issued by this Court to Meir Ohana once the assets are secured.

Respectfully submitted,

JAIKUMAR RAMASWAMY, CHIEF
ASSET FORFEITURE AND MONEY
   LAUNDERING SECTION

By:

A.J. DE KLUIVER (LA Bar #20163)
Assistant Deputy Chief
MARYBETH GRUNSTRA (NY Bar #4886362)
Trial Attorney

U.S. Department of Justice
Criminal Division
Asset Forfeiture and Money
   Laundering Section
1400 New York Avenue NW, 10100
Washington, DC  20530
Telephone:    (202) 514-1263
Fax:          (202) 616-2547

Attorneys for Applicant
UNITED STATES OF AMERICA